IN THE COURT OF COMMON PLEAS

JUVENILE DIVISION

HAMILTON COUNTY, OHIO


IN RE: RAYMOND DISHAUN HUGHES    CASE NO.: 01-17835
       COREY MAYBERRY                      01-17837
                                           01-18429
                                           01-18430
                                           01-17936
                                           01-17937
                                           01-18426
                                           01-18431


TRANSCRIPT OF PROCEEDINGS

THIS CASE CAME ON TO BE HEARD at the

Court of Common Pleas, Juvenile Division, on the 6th day of

December, 2001 before Katherine Watkins, a Magistrate of

this Court, and the following proceedings were had, to wit:

- - -

1         Q.    So you have had nine years experience?

2         A.    Correct.

3         Q.    (Inaudible)

4         A.    Ok.

5         Q.    Have you had an occasion to come into

6    contact with Corey Mayberry?

7         A.    Yes.

8         Q.    Is he sitting in the Courtroom today?

9         A.    Yes.

10             MR. LAWSON: Stipulate to that Judge on

11   both individuals.

12             THE COURT: So noted.

13        Q.    So you have had occasion to come into

14   contact with a Raymond Hughes as well?

15        A.    Yes.

16        Q.    Ok and um let me ask you.  How did you

17   have occasion to come into contact with those

18   individuals?

19        A.    I was following up on a complaint of an

20   allegation of rape that occurred at Skyline, 9907

21   Springfield Pike in the Village of Woodlawn.

22        Q.    Ok and how did you first get informed of

23   this incident?

24        A.    I got a phone call from a female by the

25   name of Gina McConnell.  She works for Concerned

1    Counseling on Montgomery Rd and she called me to tell me

2    that a client of hers...I am assuming they call them

3    clients but somebody she has as a client told her about

4    an allegation of sexual...

5              MR. LAWSON: Objection.

6              THE COURT: I think it is not for the

7    truth of the matter. Just as to reason why he is there

8    and I will allow that in.

9         A.   To tell me there was an alleged

10   allegation made by her client to her and she thought it

11   was her obligation by law to tell the police.

12        Q.   And so do you investigate that

13   allegation?

14        A.   Yes I do.

15        Q.   What do you do?

16        A.   What I started doing was, I started by,

17   um, getting a hold of the victim, alleged victim in

18   this, which was Katie Brunsman.  I contacted her mother

19   first to tell her mother what the allegation was and

20   asked her if Katie was there.  Um, I was told that Katie

21   was going to work.  Ms. Brunsman actually went and got

22   Katie and brought her to the Woodlawn Police Department.

23        Q.   What happens next?

24        A.   I interviewed her.  Um, she told me what

25   her side of what happened.  Um, what I did at that point

126

1    is that I just...I interviewed her for a very short

2    period of time.  And then I asked her if she would be up

3    to an interview with a forensic interviewer through the

4    Children's Hospital Mayerson Center.

5        Q.    What does that meeting set up?

6        A.    Yes, it was.  It was set up for the

7    following day.

8        Q.    Was that done?

9        A.    It was done and she was interviewed by

10   Sue Wolf of the Mayerson Center.

11       Q.    And were you present during that

12   interview, as well.

13       A.    I was in the observation room.  I was not

14   in the room at the time of the interview, but I was... I

15   did observe the interview.

16       Q.    Besides that, what did you do in terms of

17   the investigation?

18       A.    I interviewed, um, several other people.

19   Um, of course I didn't bring my file in here.  Um,

20   Linsey and I can't remember her last name off...

21   Teuschler, T-E-U-S-C-H-L-E-R, who also was an employee

22   there.  I talked to, um, Justin Toran, who was the

23   manager there.  I spoke with Beverly Sizelobe, S-I-Z-E-

24   L-O-B-E, who was the general manager there who was not

25   there at the time of the incident.  But, I just...I was

1    talking to everybody trying to see if there was talk

2    going on in there about an allegation or if she had

3    heard anything.  And, then I also told Pete and I don't

4    know his last name.  It is very long and complicated to

5    spell.  He is the owner of Skyline and I also told him

6    what the allegation was.

7            Q.    Okay.  So you had those contacts.  What

8    else did you do in terms of the investigation?

9            A.    Um, one thing that I learned the night I

10   interviewed Katie, which the night of the, um, report,

11   I...when I was interviewing Katie, I learned that she

12   vomited, um, while this incident was going on.  And, it

13   got on her pants.  And, I asked her if she had the

14   pants.  And she said that she does have the pants, but

15   she is not sure if her mom washed them.  And I said well

16   what did you do when you vomited on your pants.  She

17   said I tried to clean it off.  I used napkins and rags

18   and tried to clean them off and I cleaned off the floor.

19   And I said what did you do with those rags and napkins?

20   And she told me that she threw them away.  I asked her

21   if she had knowledge on whether or not the pants had

22   been washed yet and she said no that she hid them in her

23   room.

24           Q.    Okay.  So you are talking to Katie, is

25   that correct?

1    they had already been picked up, both Corey and Raymond

2    had already been picked up for the charge.  So, after I

3    got the lab report back, um, I faxed a copy to your

4    office.

5            Q.    And in terms of Corey and Raymond in

6    particular, when was the first contact that you had with

7    them?

8            A.    I had contact with Corey.  Corey is the

9    only one I had contact with face to face.  And that was

10   at 2020 Auburn Avenue.

11           Q.    And tell me how you contact with him?

12           A.    Um, he was at the Woodlawn Police

13   Department when he was being processed.  I received a

14   phone call from, um, Officer Pitch.  I asked Officer

15   Pitch to ask Corey if he wanted to talk to me.  And, I

16   actually heard because they were sitting right there in

17   our processing room and it echoes into the phone, I

18   heard him say yes.  So, I... what I did was I asked

19   Officer Pitch to please get a hold of Corey's mother and

20   confirm that it is okay.  He got back with me and told

21   that...

22                 MR. LAWSON:  Objection.

23           A.    ...he got back with me.

24                 MR. LAWSON:  Objection.

25                 THE COURT:  Sustained.  You may continue.

135

    A.    He did call me back.  Um, what I did is I
retrieved a phone call, phone number, for Corey's mother
from Officer Pitch and I called Corey's mother just to
verify that it was okay that I talk to Corey personally.

    Q.    And you spoke with Corey's mother?

    A.    I spoke with Mary Mayberry.

    Q.    And, she identified herself as Mary
Mayberry?

        MR. LAWSON:  Objection.

        THE COURT:  Um, asked was she says in
substance.  The fact that it was identified as her, I
will allow that portion in.  Go head.

    A.    Yes.

    Q.    And, um, after speaking with Mary
Mayberry, what did you do?

    A.    I went to... I was actually working an
off duty detail.  So, after that I went to 2020 and, um,
I asked for them to bring Corey down so I could talk to
him.  And they did that.

    Q.    So Corey was brought down?

    A.    He was brought down.  When I...when he
got into the room, I told him that I did talk to his
mother.  She confirmed that it was okay.

        THE COURT:  To the mother.  Just that she
confirmed that it was her.  Next question.

1      A.   He told me that they, they meaning Katie,

2  Ray and him were in the back.  They were playing around.

3  Um, he said it was...they were just joking around with

4  her.  There was nothing as far as like physical,

5  anything like that.  He just said that they were joking

6  around.  And, at one point, they were back by

7  the...there is a coat rack and I got pictures to depict

8  what the room looks like.  But there was a coat rack

9  that was right along the back of the wall by the walk in

10  refrigerator.  And, he told me they were back by the

11  coat rack and, at one point, they were away from the

12  coat rack by the door of the walk in refrigerator.  And,

13  he said Ray opened up the door.  He was pulling Katie in

14  and he was directly behind Katie.  At that point, I

15  asked him if he was pushing Katie into the room and he

16  said, no.  He says, but what he was directly behind her

17  and he said that she was trying to pull away from, um,

18  Ray.  When she was trying to pull away, her hand

19  actually did get away at one point and her elbow hit

20  Corey and he can understand how she, and this is his

21  words, he can understand how she thought that he was

22  pushing her because he was directly behind her and her

23  arm went right into his gut area.

24      Q.   What else did he tell you?

25      A.   He told me that they were inside the walk

1    in, all three of them were. And, um, Ray was kind of

2    giving her, giving Katie a bear hug, and was actually

3    pulling on her shirt. And, at one point, Katie says,

4    what are you guys trying to do, rape me. Corey told me

5    that he put his hands up in the air and he said I'm out

6    of here. And, he went to the door. He shut the door.

7    He said he slammed the door and turned off the lights.

8    Then he started flickering the lights and he was holding

9    the door for approximately 30 seconds. I asked him if

10    he could hear anything or know of anything that was

11    going on inside, even though he was outside, if there

12    was any windows, anything like that. He said there

13    wasn't any windows. But, he felt a couple thumps on the

14    door. I asked him what that was. And he says she may

15    have been trying to get out, he didn't know. Um, at

16    that point, he said that after he felt the thumps on the

17    door, he went into the dining area to sit at the counter

18    and started watching football.

19                Q.    Did he ever, um, indicate that Katie

20    consented to anything?

21                A.    No. He told me that he only had a

22    feeling that he knew what was going on inside, but he

23    didn't know what was going on inside for sure.

24                Q.    So he made no statements about statements

25    of Katie's?

1    reflect it, but there is actually like a knob that you

2    would push on and that is a full single picture and that

3    is..

4                Q.    Can you tell me which picture that is?

5                A.    Yea, if I can find it.  It is actually on

6    State's Exhibit #3C.  And that is the interior looking

7    at the door from the inside.  And it's just got one knob

8    that you would just push to open it up.

9                Q.    Beyond taking the pictures and collecting

10   the evidence and talking to Katie, what else did you do

11   in terms of your investigation?

12               A.    That was basically it.

13               Q.    Okay. Did you talk to other people?

14               A.    I talked to people within ...I'm sorry I

15   forgot that you said just with Katie.  I did talk to

16   other persons within the restaurant that either worked

17   there.  I talked to her ... some of her best friends and

18   that is basically it.

19               Q.    And you said you have not spoken with

20   Ray, is that correct?

21               A.    That is correct.

22               Q.    And, um, you haven't spoken with him at

23   all until this day, is that correct?

24               A.    We had generalized conversation.  I was

25   directed not to ask him any questions when I went to go

1    retrieve his blood.  And, um, I honored that.  And,

2    while I was there, Ray and I had had... he remembered

3    me.  He said that he remembered me from a phone theft

4    that he was not involved in.  He was just in the area at

5    the time that we were looking for the bad guy and

6    looking for the phone.  And he just told me that he

7    remembered me from that.  We just had generalize... that

8    is about it.

9         Q.   Anything else that you did that we

10   haven't talked about?

11        A.   No.  Not that I can recall.

12        Q.   And the pants that you we are speaking

13   of, where are they located currently?

14        A.   They are still at BCI in London, Ohio.

15        Q.   Okay.  Your Honor, at this point, I have

16   nothing further...

17             THE COURT:  Are you going to be

18   retrieving the pants for the evidence?

19        Q.   That's what I was going to address.  I

20   would like to, um, have him subject for recall.

21             THE COURT:  Okay.  Mr. Lawson.

22             CROSS EXAMINATION

23   BY MR. LAWSON:

24        Q.   Thank you Judge.  Going back to what

25   Corey was telling you Detective Uhl, did you tape his

1    you, would that be a correct statement?

2              A.    That is very correct.

3              Q.    Alright.  And what Katie said he saw

4    would be important too, is that a fair statement?

5              A.    Katie doesn't know what he saw.

6              Q.    What Katie said that she saw, as far as

7    the door, would that be an important statement?

8              A.    Yes.

9              Q.    Alright.  Here in the six page

10   statement..

11             THE COURT:  Are you marking that as an

12   exhibit?

13             Q.    A or...

14             THE COURT:  A.

15             Q.    I am marking this as Defense Exhibit A.

16   How many times did you interview her?

17             A.    I interviewed her one time at the police

18   station and then I observed the second interview, which

19   was done at the Mayerson Center at Children's Hospital.

20             Q.    Alright.  Now between that time and even

21   after the arrest of Raymond, have you spoken with her

22   about her testimony?

23             A.    Yes.

24             Q.    Have you went over the testimony with her

25   like tell me again what happened or anything to that

156

1    effect?

2            A.    Yes.

3            Q.    Have you spoke with her about Justin?

4            A.    About what happened in the walk in?

5            Q.    Yes.

6            A.    Um, I believe I did, yes.

7            Q.    Okay.  Oops, you know what I did.  I had

8    the exhibits on page 2.

9            THE COURT:  That's fine.  I can number it

10    now.

11            Q.    This is going to be marked as defense

12    exhibit A.  And can you tell the Court what that is.

13            A.    This is the statement.  This is the

14    written statement that Katie Brunsman did at the

15    Woodlawn Police Department.

16            Q.    This is the same night that you first

17    interviewed her?

18            A.    That is correct.

19            Q.    And did you have a chance to look it over

20    before that night?

21            A.    Before what night?

22            Q.    After she... After she wrote this

23    statement out, did you review it that night with her?

24            A.    No, I did not.

25            Q.    Did you review it at all that night?

167

1      the world.  I went back and asked her about that.  She

2      said that she...that that was a conversation in private

3      between her and somebody else in an office.

4                Q.    Between just her and Josh?

5                A.    Yes in the office.

6                Q.    And nobody else is around.  It is a

7      private conversation is that what she told you?

8                A.    Yes, yes.

9                Q.    And you never heard of a Molly?

10               A.    Have no idea who Molly is.

11               Q.    And did she say that it was a serious

12     conversation or a horseplay conversation?

13               A.    She actually didn't distinguish the

14     difference.

15               Q.    Josh thought it was something important

16     to tell you though did he not?

17               A.    I never spoke to Josh about this.

18               Q.    So each time you would find something out

19     about one of the other employees making...saying about

20     her behavior.  Her being Katie, you would confront Katie

21     with it?

22               A.    Yes. I just wanted to...if there was

23     something different than what one person said versus

24     another person.  Yes I would go inquire that.

25               Q.    Why would that be important for you to

168

do?

A.    To justify her.  To figure out what the
atmosphere was in the workplace on a regular basis.  I
thought that was important.  I mean if she is doing
table dances on her lunch break, you know.  And that is
exactly what I told her.  I said I need to know every
aspect about how the environment is on a regular basis.

Q.    And you indicated that to her when you
started this investigation.  Is that a fair statement?
You told her how important it is to know..(inaudible).

A.    No I am listening to you.  I am trying to
figure out when I actually did say that to her but...

Q.    But when you would give her these
opportunities, you would still go back and find out
other things about her that she had not come forward and
told you initially?  About the work environment?

A.    About the work environment.  Yes.

Q.    And about sexual comments being made.  Not
only by her but maybe to her?

A.    She was pretty up front at the beginning
about the sexual innuendos that were going on within the
workplace.

Q.    But there were other things that you were
finding out?  Is that a fair statement from other
employees?

1      A.    Not far different than what she had told

2   me but maybe a different way of describing it.   You

3   know...two people could be watching the exact same thing

4   but have different views.

5      Q.    But she never told you that she was

6   telling other employees about giving head?  Did she?

7      A.    She only mentioned the one time that she

8   was talking to Josh.

9      Q.    But that was after you confronted her.   I

10   guess is my point, detective?  You went back and told

11   her you had heard that I believe your testimony was a

12   few minutes ago.  And she confirmed it?

13      A.    I believe so. Yes.

14      Q.    And she tried to explain it to you?

15      A.    Yes.

16      Q.    But she never volunteered that to you?

17      A.    Yes, that's true.

18      Q.    How many times did you find something out

19   and go back and talk to her about it?

20      A.    I would say probably three or four.

21      Q.    And was she able to give you a reason as

22   to why she didn't initially tell you for these three or

23   four different occasions, was she able to explain it

24   away?

25      A.    She was always able to explain why

1    Q.    Gross sexual imposition, that came up

2    when we were in Court.  I believe your testimony was

3    that up until that point she had never indicated to you

4    those allegations?  Is that a fair statement?

5    A.    She did but she was not sure when it

6    occured and um I took this a lot more seriously than I

7    did that but she did bring it up, yes.

8    Q.    Let me ask you this.  Were you able to

9    find any other witnesses...let's exclude her best friend

10    Lindsey, any other customers or witnesses that would

11    verify the things that she told you that Raymond and

12    Corey used to do to her that she didn't want them?

13    A.    Are you talking about hitting or

14    anything?

15    Q.    I am not talking about horseplaying.

16    Excude horseplay out.  I'm talking about seriously

17    hitting her chest with his fist as hard as he could or

18    anything to that effect?

19    A.    Yes.

20    Q.    Who?

21    A.    It would just be Lindsey, she said that

22    she had told Lindsey that.

23    Q.    She had told Lindsey?

24    A.    Right.

25    Q.    Anybody who witnessed it?